IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CAROL L. COX                          )
                                      )
v.                                    )    No. 3:05-0030
                                      )    Judge Wiseman/Brown
JO ANNE B. BARNHART, Commissioner     )
of Social Security                    )

To:  The Honorable Thomas A. Wiseman, Jr., Senior Judge

## REPORT AND RECOMMENDATION

        This is a civil action filed pursuant to 42 U.S.C. §
405(g), to obtain judicial review of the final decision of the
Commissioner of Social Security denying plaintiff disability
insurance benefits (DIB), as provided under Title II of the
Social Security Act, as amended.  The case is currently pending
on plaintiff's motion for judgment on the administrative record
(Docket Entry No. 11), to which defendant has responded (Docket
Entry No. 13).  For the reasons stated below, the Magistrate
Judge recommends that plaintiff's motion for judgment be GRANTED,
and that the decision of the Commissioner be REVERSED and the
cause REMANDED for further administrative proceedings, including
reconsideration of plaintiff's RFC and further development of the
vocational evidence.


## I.  INTRODUCTION

        Plaintiff protectively filed her DIB application on

1

July 5, 2001 (Tr. 72-74). Plaintiff alleged disability beginning December 31, 1999, as a result of a back condition and balance problems (Tr. 11). Plaintiff's application was denied initially and upon reconsideration (Tr. 49-52, 53-54). On March 9, 2004, a hearing was held before an Administrative Law Judge (ALJ), during which plaintiff was represented by counsel and gave testimony (Tr. 21-44). On August 6, 2004, the ALJ issued a written decision finding plaintiff not disabled at any time prior to her date last insured (DLI) (Tr. 8-18). The ALJ made the following findings:

1.      The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through September 30, 2002, but not thereafter.

2.      The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.      The medical evidence establishes that, during the period from December 31, 1999 through September 30, 2002, the claimant had vertigo, degenerative joint disease of the knees, and osteoarthritis of the cervical and lumbar spine which are "severe" impairments based on the requirements in the Regulations 20CFR § 404.1520(c).

4.      These medically determinable impairments however did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The undersigned finds the claimant's allegations during the period at issue are credible only to the extent acknowledged within the narrative portion of this decision.

6.      During the period at issue, the claimant retained the residual functional capacity to perform sedentary work (i.e., lifting a maximum of 10 pounds at a time, standing/walking for 2 hour total, and sitting for 6 hours total during an 8 hour workday).

2

7.       The claimant's past relevant work as executive secretary, as this job is generally performed in the national economy, did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

8.       The claimant's impairments did not prevent her from performing her past relevant work as an executive secretary on or before September 30, 2002 (DLI).

9.       The claimant was not under a "disability" as defined in the Social Security Act, at any time through September 30, 2002 (20 CFR §§ 404.131 and 404.1520(f)).

(Tr. 17-18).

On November 19, 2004, the Appeals Council denied plaintiff's request for review of the decision of the ALJ (Tr. 4-6), thereby rendering that decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. Id.


## II.  REVIEW OF THE RECORD

Neither party has endeavored to summarize the record in their briefs to this Court. The ALJ summarized the record as follows:

The claimant testified that she worked as an executive secretary for the same employer some 18 years. She quit work at the end of December 1999 due to vertigo. The claimant testified

3

that her job duties included transcribing, preparing breakfast/lunch 3 to 4 times a week for business associates, traveling to out-of-state meetings, cleaning the office, lifting/carrying files from downstairs, conducting job interviews, and running personal errands for the boss and his wife. She said the job required a good bit of standing/walking (about 30% of the day) and she was also required to lift 25 to 30 pounds on a frequent basis. The claimant feels she is disabled because she can no longer perform her job as she did previously. Her complaints at the hearing included arthritis in her back, stomach problems, and balance problems. She reportedly injured her back in a prior boating accident in 1989 and alleges continued pain in her back and cervical spine. The claimant said she had gallbladder surgery in 1999 and subsequently developed a bacterial infection in her intestines. She testified that she was on Vicodin for 4 months. The claimant testified that she has had "balance problems" since the surgery. She can maintain her balance if she is holding onto something but otherwise she tilts and falls. She testified that she drives and does not have a handicap permit. The claimant further testified that she recently had knee replacement surgery. As previously noted, the claimant must establish that she was disabled on or before September 30, 2002 (DLI).

The claimant's remote medical history (June 1990) is

significant for compression fracture at L4 (Exhibit 1F) which subsequently healed with a two month period (Exhibit 6F, p. 27). Her past history is notable for occasional symptoms associated with GERD which are controlled with Prilosec or Prevacid. The claimant had a prior EGD and dilation of the esophagus in 1997. In October 2001, the claimant was diagnosed with recurrent dysphagia and two weeks later underwent successful esophageal dilation. The claimant was continued 30 mg. of Prevacid daily (Exhibit 8F).

In June 1999 the claimant presented with severe epigastric pain with radiation into the back. Following a CT of the abdomen, the claimant underwent gallbladder surgery (Exhibit 6F). Postoperatively, the claimant developed diarrhea and hematochezia. A sigmoidoscopy performed on June 7, 1999, showed acute colitis (Exhibit 3F). The claimant was treated with Vancomycin. When seen by Dr. Glassell for her follow up visit on June 18, 1999, the claimant reported that her pain and diarrhea had resolved. Assessment was of resolution of recent pseudomembranous colitis. However, the claimant required another course of Vancomycin in August 1999 (Exhibit 8F).

Following gallbladder surgery the claimant reported problems with equilibrium and complained of feeling constantly dizzy. She was found to have impacted cerumen bilaterally which was removed on June 30, 1999. The claimant was treated with

Meclozine and Zyrtec. As recommended, she also tried Diazepam with some improvement but she continued to report problems with vertigo. In July 1999 audiogram showed excellent hearing. Tympanograms were normal. Additional studies, including MRI and MRA were normal. However, electronystagmogram was abnormal (Exhibit 8F). In August 199 Dr. Smith referred the claimant to Dr. Jackson for evaluation of chronic vestibular dysfunction (Exhibit 6F).

In a medical report dated September 15, 1999, Dr. Jackson reported that ENG revealed a right directional preponderance. Neurotologic evaluation and ABR were normal. According to Dr. Jackson, the exact etiology of the claimant's problem remains unknown. As recommended the claimant participated in vestibular rehabilitation therapy and as of November 16, 1999, she was greatly improved. However, she continued to have some ataxia on uneven surfaces. Continued therapy was recommended (Exhibit 3F). Office note from Dr. Smith dated October 24, 2000, reveals that claimant's vertigo was still present but improved to the point that the claimant said she "is able to deal with it now" (Exhibit 6F).

On November 30, 2000, the claimant was admitted to the hospital for evaluation of right breast mass. Past medical history showed hiatal hernia, GERD, and previous back injury. There was no mention of vertigo. Current medications were listed

6

as Premarin and Claritin.  The claimant reported arthritis in her back but denied any limited motion.  Excision biopsy of the breast mass was performed.  Pathology report revealed benign tissue (Exhibit 5F).

Clinical records from Dr. DeVries, orthopedist, covering the period from January 22 through September 14, 2001, show that the claimant was treated for back pain secondary to osteoarthritis.  When seen in January 2001, the claimant reported that she had recently traveled to Florida by car and noticed progressive back pain.  She denied any numbness, paresthesias, or radiculopathy.  Physical examination was positive for muscle spasms.  Straight leg raising test was negative.  X-rays revealed old compression fracture at L4 with degenerative changes at L3-4 and L5-S1.  The claimant was started on Celebrex and was instructed to obtain a warm mold back brace.  She returned a month later (February 2001) reporting resolution of her pain and exhibited excellent range of motion on exam.  Celebrex was continued.  The claimant was next seek by Dr. Smith on July 6, 2001, complaining of severe pain in her cervical and lumbar spine and chronic vertigo.  Examination revealed decreased range of motion in the lumbar spine.  Dr. Smith reported that the claimant appeared somewhat unsteady in changing positions due to vertigo. Darvocet N 100 was added to the claimant's medication regimen. Dr. Smith opined that the claimant "is now totally disabled from

any gainful employment due to her back problems and chronic vertigo." The claimant was again seen by Dr. DeVries in September 2001 and reported onset of severe pain involving the cervical spine. X-rays of the cervical spine showed severe degenerative changes throughout. Dr. DeVries advised that he did not feel the claimant would be able to return to work with the extent of her arthritis and the pain which has been progressive in nature. A trial of Mobic was recommended and epidural steroid injections were discussed (Exhibit 6F).

On November 1, 2001, the claimant was referred for a consultative examination which was performed by Dr. Donita Keown. The claimant complained of balance problems and pain in her lower back and knees. She said she is lightheaded with positional changes but does not have the sensation that the room is spinning. She reports osteoarthritis in her knees and back. The claimant does not use an assistive device for ambulation but said she typically walks with a family member assisting her because she stumbles. Current medications include Premarin, Prevacid, Mobic, and Lotrel. The claimant was 63.5 inches tall and weighed 134 pounds. Blood pressure was 120/62. Dr. Keown reported that the claimant appeared much younger than her stated age of 64. Examination of the neck revealed pain with range of motion testing. the claimant had full range of motion in her shoulders, elbows, wrists, hand, hips, knees, and ankles. The knees were

8

slightly enlarged and there was some crepitus.  Range of motion
in the lumbar spine was mildly reduced due to pain.  Straight leg
raising test was negative.  Gait and station testing revealed a
straightaway walk performed with good effort.  The claimant had
full range of motion in her shoulders, elbows, wrists, hand,
hips, knees, and ankles.  The knees were slightly enlarged and
there was some crepitus.  Range of motion in the lumbar spine was
mildly reduced due to pain.  Straight leg raising test was
negative.  Gait and station testing revealed a straightaway walk
performed with good effort.  The claimant stumbled twice when
attempting to walk across the room.  Romberg was positive and
performed with good effort.  Reflex was +1 at the right patella
and +2 on the left.  Dr. Keown reported that the claimant has
ataxia most likely secondary dysfunction or brain stem insult.
Based on the exam, Dr. Keown reported that the claimant could sit
at least 6 hours in an 8 hour day, walk or stand with the use of
an assistive device, but could not lift or carry (Exhibit 9F).

        Updated medical records show that the claimant was seen
by Dr. DeVries on March 28, 2002, for follow up of neck pain.
She also reported pain in both knees.  Examination of the neck
revealed very limited range of motion.  Strength was normal at
5/5.  There was marked patellofemoral crepitus in the knees
bilaterally but no evidence of instability.  The claimant
reported that she plans to go to Naples, FL, next week.  Celebrex

9

was continued and the right knee was injected. At her return visit in April 2002 x-rays of the cervical spine showed degenerative changes. The claimant reported improvement in her right knee pain. Therefore, she requested and received an injection in the left knee. The claimant was referred for a cervical epidural injection which provided only short term relief. In fact, at her return visit in June 2002, the claimant reported progressive cervical symptoms. Therefore, she was switched to Bextra, 20 mg. daily, and was given Darvocet to take at night. When seen in August 2002, the claimant was referred for x-rays of the knees which showed significant patellofemoral arthrosis. Diagnoses included cervical osteoarthritis and degenerative joint disease of the knees bilaterally. The claimant received immediate relief of left knee pain following an injection of Xylocaine, Marcaine, Depo-Medrol, and Dexamethasone. Instructions were to continue Bextra and return in 3 weeks. At her return visit in September 2002, the claimant was diagnosed with right shoulder impingement. An injection in the shoulder provided some symptom relief. The dosage of Bextra was increased to 20 mg. and physical therapy was recommended for rotator cuff strengthening. A subsequent MRI of the shoulder performed in December 2002 showed some small accounts receivable joint arthrosis but no rotator cuff tear (Exhibit 11F).

As alluded to in the above summary of plaintiff's

10

hearing testimony, in January 2004 (roughly sixteen months after plaintiff's DLI) plaintiff was diagnosed with end stage degenerative joint disease of the left knee, and underwent surgery for a total replacement of that joint (Tr. 241-48).

### III. CONCLUSIONS OF LAW

#### A. <u>Standard of Review</u>

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. <u>Jones v. Secretary</u>, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. <u>Landsaw v. Secretary</u>, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." <u>Her v. Commissioner</u>, 203 F.3d 388, 389 (6th Cir. 1999)(<u>citing</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." <u>Bell v. Commissioner</u>, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached.

11

Her, 203 F.3d at 389 (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. Hurst v. Secretary, 753 F.2d 517, 519 (6th Cir. 1985).

B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
(2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[1] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.
(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to

---

[1] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

12

such past relevant work, the claimant establishes a <u>prima facie</u> case of disability.

(5) Once the claimant establishes a <u>prima facie</u> case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

<u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. <u>Id.</u> In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's <u>prima facie</u> case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. <u>See</u> <u>Varley v. Secretary</u>, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of

13

all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. <u>See</u> 42 U.S.C. § 423(d)(2)(B).

### C. <u>Plaintiff's Statement of Errors</u>

Plaintiff challenges the ALJ's treatment of the vocational expert testimony, which plaintiff alleges clearly indicates that the limitations <u>mentioned</u> by the ALJ would eliminate all work. However, plaintiff appears to reach this conclusion by looking to the ALJ's hypotheticals including a sit/stand at will option, and a moderate loss of ability to sustain concentration due to pain. Notably, the ALJ did not include these limitations in his determination of plaintiff's RFC. Rather, he determined that she possessed the RFC for sedentary work, with the pertinent exertional limitations and no nonexertional limitations. Accordingly, it was not error for the ALJ to rely on the VE's testimony that plaintiff's past relevant work as an executive secretary was generally performed in the economy at the sedentary level (Tr. 39-40), in finding that plaintiff could return to that past relevant work. The VE's testimony in response to hypotheticals which include limitations that plaintiff was not actually found to suffer from is simply irrelevant. The law clearly allows for the availability of past relevant work to be determined based on the requirements of such work as it is generally performed in the economy, **or** as it was

14

specifically performed by plaintiff for her prior employer.
Bowen v. Yuckert, 482 U.S. 137, 146 (1987). While plaintiff
could not return to her prior job (performed at the light level
of exertion), she could perform those sedentary jobs generally
available within that occupational title, in light of the ALJ's
finding of her RFC.

      Plaintiff next alleges that the ALJ failed to explain
why he discounted plaintiff's claim of vertigo and her treating
physician's findings corroborating these symptoms, and that he
failed to explain his "complete disregard" of treating
orthopedist, Dr. DeVries. While the undersigned does not agree
that the ALJ completely disregarded the opinion of Dr. DeVries[2]
-- who was one of two treating physicians who opined (albeit in
conclusory fashion) that plaintiff was disabled by her
impairments -- there does appear to be error in the ALJ's
treatment of plaintiff's complaints of vertigo, her confirmed

---

[2]The ALJ summarized Dr. DeVries' treatment of plaintiff's orthopedic
impairments, and recognized that Dr. DeVries had opined that plaintiff would
be unable to return to work as a result of her "arthritis and the pain that
has been progressive in nature." (Tr. 14, 154). While the ALJ dealt
specifically with Dr. Smith's opinion that plaintiff was "totally disabled"
later in his narrative opinion, finding it to be a conclusory opinion on an
issue reserved to the Commissioner and lacking the support of any specific
limitations/restrictions identified by Dr. Smith (Tr. 16), Dr. DeVries'
opinion of plaintiff's disability was not given separate treatment. However,
in addressing plaintiff's subjective credibility, the ALJ noted those
activities which he deemed inconsistent with the claim of disability, and also
noted that "no specific limitations were identified [by] *any treating source*
prior to the claimant's DLI." (Tr. 16, emphasis added). It is thus clear
that the ALJ took account of Dr. DeVries' treatment notes and his opinion as
to plaintiff's disability, but found them undermined by the doctor's failure
to specifically assess the work-related limitations that prevented her return
to the workforce.

Case 3:05-cv-00030   Document 14   Filed 04/12/06   Page 15 of 24 PageID #: 45

vestibular dysfunction, and the extent to which the evidence of these impairments conflicts with his findings of no listing-level impairment and an RFC for sedentary work.

Plaintiff has reported that her falling and balance problems were the main reason that she could no longer work (Tr. 214), and this is echoed in her agency paperwork, where she used a pain questionnaire to document her balance problems in detail (Tr. 103-06). Third party questionnaires submitted by plaintiff's daughter and a friend also speak to the significance of plaintiff's balance problems (Tr. 107-114).

As reflected in the summary of medical evidence above, plaintiff's balance problems began in June 1999, following gallbladder surgery and a subsequent inpatient bout of infectious colitis. Two weeks after that surgery, she was described as "having a great deal of problems with vertigo," was unable to walk without support, and was scheduled to have her ears cleared of impacted cerumen which prevented either eardrum from being seen (Tr. 161). It was hoped that the removal of this cerumen would resolve plaintiff's vertigo, but in August 1999, treating physician Dr. James Smith, a general practitioner, dictated the following treatment note:

> Carol has really had terrible vertigo and vestibular
> dysfunction every since surgery. She woke up from
> surgery a few months ago extremely dizzy and has been
> dizzy since that time. Recent testing by Dr.
> Richardson with an electronystagmogram pointed to a
> definite vestibular lesion in the left side. She has

16

had a normal MRI and MRA which ruled out a tumor
disease in that area, but she still is very
vertiginous.  Nothing has seemed to help.  I told Carol
today that I really thought that she should go and seek
the advice of an otologist about her condition.  She
feels that she had a light stroke during her surgery.
I am not sure what the etiology of this is, but it did
appear to start just after she was operated on for her
gallbladder.  At least she is incapacitated now due to
the severe chronic vestibular dysfunction. ...

(Tr. 160).

On August 18, 1999, plaintiff was seen in the office of

Dr. C. Gary Jackson, an otologist.  The examining doctor's

impression was "peripheral vertigo probably ischemic" (Tr. 138),

and upon electronystagmogram (ENG) testing, plaintiff was further

assessed as having a right directional preponderance (Tr. 136).

After noting that the exact etiology of plaintiff's vertigo was

unknown, but that ototoxicity or ischemia were possibilities, Dr.

Jackson decided to treat plaintiff with a course of vestibular

rehabilitation therapy (Tr. 135).  On November 16, 1999, Dr.

Jackson reported that plaintiff was "greatly improved" following

her therapy, but continued to have ataxia[3] on uneven surfaces,

and was therefore recommended to pursue another course of

vestibular rehabilitation therapy (Tr. 134).

Almost a year later, on October 24, 2000, Dr. Smith

noted that plaintiff's persistent vertigo was better, "[s]till

present, but it is to a point where she can deal with it now."

---

[3]Ataxia is the failure of muscular coordination.  <u>Dorland's Illustrated
Medical Dictionary </u>("<u>Dorland's</u>"), 153 (28th ed. 1994).

17

(Tr. 159). However, in a treatment note dated July 6, 2001, Dr. Smith noted that plaintiff "has major disability of chronic vertigo due to vestibular dysfunction since an operation a couple years ago. She is very vertiginous most of the time. Has been to otologists with very minimal relief of symptoms over the last year, year and a half." (Tr. 155). Dr. Smith concluded this treatment note by stating that "I think she is now totally disabled from any gainful employment due to her back problems and chronic vertigo." (Id.).

On November 1, 2001, plaintiff was consultatively examined at government expense by Dr. Donita Keown (Tr. 214-17). Dr. Keown noted that plaintiff walks without an assistive device but stumbles (Tr. 215). Results of Dr. Keown's neurological testing were as follows:

> Station and gait testing reveal a straightaway walk performed with good effort. She stumbles twice when attempting to walk across the examining room. During tandem walking, stumbling is observed immediately. She could not one-foot-stand. Romberg[4] was overwhelmingly positive and performed with good effort.

(Tr. 216). Dr. Keown assessed plaintiff with ataxia and a mild reduction in range of motion of the lumbar spine, and opined that, based on her exam, plaintiff could sit at least six hours in an eight-hour day and could walk or stand with the use of an

---

[4]Romberg's sign is a swaying of the body or falling when standing with the feet close together and the eyes closed, a result of a loss of joint position sense. Dorland's at 1526.

18

assistive device, but could not lift or carry (Tr. 216).

After finding that plaintiff's vertigo and osteoarthritic impairments were "severe," but not severe enough to meet or medically equal the criteria of any listed impairment, the ALJ considered the evidence of these impairments in comparison to plaintiff's testimony and other subjective complaints of disabling functional limitations. The ALJ found that plaintiff's subjective pain complaints were objectively supported by radiographic evidence of osteoarthritis in plaintiff's cervical and lumbar spine as well as both knees (Tr. 16). He went on to find that,

> [a]lthough current evidence shows significant progression of the claimant's arthritis, such was not the case prior to her DLI. As previously noted, the claimant must establish disability commencing during the period from December 31, 1999 (AOD) through September 30, 2002 (DLI). Evidence shows that during this period of time the claimant was being treated for persistent vertigo and back, neck, and knee pain related to osteoarthritis. However, the claimant required no assistance in caring for her personal needs, continued to drive, and was able to make long automobile trips from Tennessee to Florida to visit family members. The claimant testified that she had to make frequent stops while traveling but the fact that she was able to sit and ride for approximately 2 hours at a time suggests sedentary capability. As previously pointed out, no specific limitations were identified [by] any treating source prior to the claimant's DLI. The claimant's subjective complaints are found to be credible and convincing only to the extent that she was limited exertionally to no more than sedentary work during the period at issue.

(Tr. 16-17).

While the evidence of plaintiff's level of arthritic

19

pain during the period at issue is inconsistent enough to justify the ALJ's credibility finding despite the treating orthopedist's opinion that the pain was disabling, the same cannot be said about the evidence of plaintiff's vertigo and resulting work-related limitations. The ALJ notes that while plaintiff's treating physicians have opined that she is disabled, no treating source has assigned specific functional limitations. Indeed, only one examining source has provided an assessment of plaintiff's work-related functional capacity: Dr. Keown. The ALJ addresses Dr. Keown's report, finding that her assessment of plaintiff's ability to sit for at least six out of eight hours "appears to be well supported and has been assigned significant weight." (Tr. 16). This part of Dr. Keown's assessment was thus viewed by the ALJ as supportive of his prior finding of plaintiff's RFC for no more than sedentary work. (Id.).

However, this assignment of significant weight to only that portion of Dr. Keown's assessment which is consistent with the ALJ's finding of a sedentary RFC is error, in light of the balance of that report which clearly supports the statements of plaintiff and third party witnesses -- as well as the opinion of treating physician Dr. Smith -- about the functional impact of her vertigo. Dr. Keown observed plaintiff's repeated stumbling despite good effort on neurological testing, noted an "overwhelmingly positive" Romberg's sign, and essentially opined

20

that plaintiff's vestibular dysfunction left her unable to stand/walk unassisted, or to lift/carry at all. The ALJ cited these findings in his summary of the evidence, but failed to explain why only the finding of ability to sit was entitled to credence. While the record shows that plaintiff received some benefit from vestibular rehabilitation therapy (Tr. 134), the results of this therapy were evidently not enduring, nor was it ever entirely effective in resolving plaintiff's ataxia. Likewise, though Dr. Smith on one occasion said that plaintiff's vertigo had improved to the point that she could tolerate it (Tr. 159), this tolerance certainly appears to have been transitory (see Tr. 155), and even were it not, there is no indication that such tolerance equates with an ability to lift/carry and stand/walk as required in the performance of sedentary work. Whether or not plaintiff can lift up to ten pounds and carry small items in the performance of job duties "is no mere detail," but is by definition a requirement of sedentary work; if plaintiff could not lift this weight and could walk only with a cane or other assistive device, "she was plainly not fit for sedentary work," or at least the full range of such work. Smalls v. Shalala, 996 F.2d 413, 417 (D.C. Cir. 1993); 20 C.F.R. § 404.1567(a).

The medical record in this case contains the opinions of treating sources who, without specifically assessing

plaintiff's work-related limitations, assessed plaintiff as being disabled; the opinion of the consultative examiner, whose assessment of work-related limitations does not support a finding of sedentary RFC; and the opinions of the non-examining state agency physicians, whose assessments were given little weight because they were not restrictive enough. The non-medical factor upon which the ALJ appears to place the most reliance -- plaintiff's ability to sit through a lengthy drive -- does not speak to plaintiff's ability to meet the other requirements of sedentary work. Thus, the ALJ's finding of plaintiff's RFC for the full range of sedentary work is not supported by substantial evidence.

It is noteworthy that the VE did not testify that the past relevant job of executive secretary required anything less than the full capacity for sedentary work. Nor was the VE asked about what effect the need for a cane or other assistive device to walk (which would appear to be a workplace need, despite plaintiff's decision to steady herself in other environments by leaning on a wall or a family member) would have on plaintiff's ability to meet sedentary job demands.

Having found legal error in the ALJ's findings on the issues of plaintiff's RFC and her ability to return to past relevant work, the undersigned must recommend that this matter be remanded for further administrative proceedings. In particular,

22

such further proceedings should include reconsideration of plaintiff's RFC and further development of the vocational evidence. In light of the limited and remote time period at issue here, the undersigned would not require the ALJ to rehear the matter.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment be GRANTED, and that the decision of the Commissioner be REVERSED and the cause REMANDED for further administrative proceedings, including reconsideration of plaintiff's RFC and further development of the vocational evidence.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

23

**ENTERED** this 12th day of April, 2006.

  /s/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge